OPINION
On appeal appellant, Ann M., the mother of Gary M., Mary M., and Johnathon M., sets forth the following assignments of error:
 "I. THE TRIAL COURT ERRED TO PREJUDICE OF THE APPELLANT MOTHER BY GRANTING PERMANENT CUSTODY TO LCCS WHERE THE EVIDENCE FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT SUCH GRANT OF CUSTODY IS IN THE BEST INTEREST OF THE CHILDREN.
 "II. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT MOTHER BY GRANTING PERMANENT CUSTODY OF THE CHILDREN TO LCCS BECAUSE THE STATE FAILED TO MEET ITS BURDEN OF PROOF AND THE JUDGMENT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 "III. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLATE [SIC] MOTHER BY DEPRIVING HER DUE PROCESS BY EFFECTIVELY DENYING HER FUNDS NEEDED TO OBTAIN THE SERVICES OF A PSYCHIATRIST OF HER OWN CHOOSING TO ASSIST HER IN MEETING AND REBUTTING THE MENTAL EVALUATIONS PAID FOR AND PRESENTED BY LCCS."
Appellant Christopher D., father of Gary M., sets forth the following assignments of error:
"Assignment of Error No. 1
 "I. The trial court's decision to grant permanent custody of Gary M. to L.C.C.S.B. abridged Appellant Christopher D.'s right to due process of law guaranteed by the United States and Ohio Constitutions.
 "A. The trial court's finding that Gary M. cannot be placed with Christopher D. within a reasonable period of time or should not be placed with Christopher D. is not supported by clear and convincing evidence.
 "B. L.C.C.S.B. failed to use reasonable efforts to reunite Gary M. with his father.
"Assignment of Error No. 2
 "II. L.C.C.S.B. failed to consider suitable relatives for custody of Gary M. in violation of the requirements of Ohio Rev. Code § 2151.01 et seq.; alternatively, Ohio Rev. Code § 2151.414(B) as applied created an arbitrary and unreasonable distinction between children subject to a motion for permanent custody and orphans in violation of the Fourteenth Amendment's Equal Protection Clause.
"Assignment of Error No. 3
 "III. The trial court erred in granting permanent custody of Gary M. to L.C.C.S.B. because permanent custody was not in the child's best interest."
Appellant John M., father of Johnathon M., sets forth the following assignments of error on appeal:
"First Assignment of Error
 "I. THE TRIAL COURT'S JUDGMENT AWARDING PERMANENT CUSTODY OF JOHNATHON M. TO APPELLEE LUCAS COUNTY CHILDREN SERVICES IS VOID BECAUSE SERVICE ON APPELLANT, THE CHILD'S FATHER, WAS IMPROPERLY MADE BY PUBLICATION WHERE LCCS KNEW OR THROUGH REASONABLE DILIGENCE COULD HAVE KNOWN, APPELLANT'S RESIDENCE FOR PERSONAL SERVICE.
"Second Assignment of Error
 "II. THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE BY GRANTING PERMANENT CUSTODY OF JOHNATHON M. TO LCCS WHERE CLEAR AND CONVINCING EVIDENCE DOES NOT SUPPORT ITS DETERMINATION THAT ONE OR MORE OF EIGHT FACTORS ENUMERATED IN R.C. 2151.415(E) EXISTED TO SUPPORTED [SIC] ITS FINDING THAT THE CHILD COULD NOT BE PLACED WITH HIS PARENTS."
Appellant Ann M.'s relationship with LCCSB began in October 1992, when Mary M. was mauled by a puppy while she was lying unattended on Ann M.'s living room couch at 1:30 or 2:30 a.m. Mary M., who was four months old at the time of the incident, sustained multiple scratches to her face and lacerations to her ear. The child was subsequently admitted to the hospital and Michele Kunkle, an LCCSB caseworker, was called to investigate the incident. As part of her investigation, Kunkle visited Ann M.'s home, after which she recommended that Ann M. receive training in parenting and housekeeping skills.
In June 1993, Nicole Williams, a LCCSB caseworker, noticed Gary M., who was then four years old, wandering alone in a parking lot while Mary M. slept in Ann M.'s car. William's car happened to be parked behind Ann M.'s car in the parking lot. After unsuccessfully attempting to locate the children's mother, Williams called Toledo Police. When Ann M. eventually came back to the car, Williams told her a referral would be made to LCCSB.
In September 1993, LCCSB received another referral, based on Ann M.'s inability to keep her house clean and to adequately supervise Gary M. and Mary M. As a result of this referral, Kunkle again was assigned to work with Ann M. to improve her housekeeping skills. Ann M.'s trailer home was in such poor condition that Kunkle and five other volunteers rented a rinse-n-vac and spent five hours cleaning the trailer.
In March 1994, LCCSB again became involved with Ann M.'s family when Gary M. reported that Mary M., who was then two years old, had been sexually abused by a baby sitter. As a result of this referral Mary Chamberlain, an LCCSB family outreach worker, worked with Ann M. to improve her parenting and housekeeping skills, and to help her choose appropriate care givers for Gary and Mary M. During the course of Chamberlain's involvement with the case, Ann M. gave birth to Johnathon M.
On July 15, 1994, a woman reported to Toledo Police that Ann M.'s three small children had been left with her by a man she did not know. George Kral, the police officer who responded to the call, noted that the children appeared hungry, dirty and tired. Kral transported the children to LCCSB and eventually notified Ann M. of their whereabouts. On that same day, LCCSB filed a complaint in dependency and neglect, and was awarded interim temporary custody of Gary, Mary and Johnathon M.
Ann M. was evaluated by psychologist Eric Nicely in August 1994. After interviewing Ann M. and administering several tests to evaluate her mental and emotional state, Nicely issued a written report in which he concluded that Ann M. was "clearly delusional" and suffered from a "Delusional Disorder." Examples of Ann M.'s delusional thinking cited by Nicely were:
 "1) belief that as a child she was held down by teenagers and injected repeatedly with syringe needles, 2) that in Kansas, she was responsible for baby-sitting more than thirty children simultaneously, 3) belief that CSB [LCCSB] caseworkers were injecting her own children with syringe needles, 4) belief that she had a good relationship with her physician when in fact, he terminated her as a patient due to her aggressive and disruptive office behavior, 5) belief that she has involved the FBI in her struggle against CSB, 6) belief that she has been raped on various occasions under the most bizarre of circumstances. Her delusions betray either a victimization theme or an expansive theme of personal accomplishment."
Nicely concluded in his report that Ann M.'s prognosis was "guarded at best," and stated that she might benefit from antipsychotic medication and psychotherapy.
The adjudication and dispositional hearings could not be heard within the ninety day statutory time frame; therefore, on October 19, 1994, LCCSB filed a second complaint in dependency and neglect and a motion for shelter care hearing. The complaint restated events which occurred prior to August 1994, and further stated that Ann M. had been involved in parenting classes offered by the agency, and had been provided day care through the Department of Human Services, but had lost the day care services for failure to comply with agency requirements. The complaint also alleged that the fathers of Gary M. and Johnathon M. were incarcerated, and that none of the children had a relationship with their respective fathers. Finally, the complaint alleged that the psychological evaluation performed on Ann M. demonstrates that she "has difficulty distinguishing between reality and fantasy," and that she "would be [a] risk to her children in her present mental condition." An emergency shelter care hearing was held that same day by a juvenile court referee. None of the children's fathers attended the hearing. At the conclusion of the hearing, the referee granted temporary custody of the children to LCCSB, and they were placed in a foster home. The referee's order was subsequently reviewed and approved by the trial court on October 20, 1994.
LCCSB referred Ann M. to Harbor Behavioral Health Center ("Harbor"), where she received a psychological evaluation by Debbie Morgal, a psychiatric clinical nurse specialist, on October 28, 1994. As a result of the assessment, Morgal concluded that Ann M. had a delusional disorder, and referred her to Cynthia L. Evans, M.D., a psychiatrist employed by Harbor.
The initial case plan, filed on November 15, 1994, named Chris D. as Gary M.'s father, John M. and Donald S. as Johnathon M.'s alleged fathers, and Donald G. as Mary M.'s father, and stated that all four men would be provided with copies of the case plan. The case plan further provided that Ann M. and the children's fathers would attend scheduled conferences with caseworkers, and John M. would complete the paperwork necessary to establish paternity of Johnathon M. The case plan also provided that Ann M. would attend therapy sessions with Dr. Nicely, would "gain insight into her capabilities and deficiencies as a parent" by attending parenting classes, have a drug and alcohol assessment, and learn "to properly care for her children and their needs in a safe, clean environment" by having "in-home, hands-on, parenting skills and housekeeping" training by a professional provided by LCCSB. Also pursuant to the case plan, Ann M. was to have supervised visits with the children at the agency twice a week.
On November 28, 1994, an adjudication hearing was held before a referee, after which the referee found that Ann M. "is delusional and not capable of caring for these children in her present condition," and that clear and convincing evidence was presented that the children are dependent and neglected. Immediately after the adjudication hearing, the matter proceeded to dispositional review, after which the referee granted LCCSB's request for continued temporary custody of Gary, Mary and Johnathon. On December 27, 1994, Ann M. filed handwritten objections to the referee's report. On January 9, 1995, the trial court approved and adopted the referee's report.
On January 27, 1995, Ann M. received a psychiatric evaluation by Dr. Evans, who concluded, based on a thirty minute interview with Ann M. and a review of Nicely's test results and written report, that Ann M. suffered from a delusional disorder, and that her prognosis for improvement was very poor. Evans did not recommend that Ann M. receive drug therapy for her condition. On February 8, 1995, the trial court denied Ann M.'s objections to the referee's report. On February 28, 1995, an amended case plan was filed, which documented a change in placement to a foster home where all three children could be together. The amended case plan was approved and adopted by the trial court on March 8, 1995.
In April 1995, Ann M. began regular therapy sessions with Debbie Morgal.
On June 14, 1995, LCCSB filed a motion for permanent custody. Copies of the motion were served on all parties, with John M. being served with the LCCSB's motion at the Lucas County Jail. On June 27, 1995, the trial court was notified that service on John M. had not been obtained, because he was no longer at the Lucas County Jail, but had been moved to the Orient Correctional Institution, and that notice would be sent by certified mail to that address. On July 11, 1995, service on John M. was obtained by certified mail. On August 7, 1995, service on John M. was also obtained by publication.
On July 10, 1995, an amended case plan was filed and approved, which noted that Donald S., one of Johnathon's alleged fathers, was seeking custody of Johnathon, and granted Donald S. and his wife, Rhonda S., visitation rights with Johnathon. On August 22, 1995, Shema Wamhoff, the court appointed guardianad litem for the children submitted a written report to the trial court, in which she concluded that Ann M. is not capable of assuming parenting responsibilities for the children, and that it is in their best interest to remain together in the permanent custody of LCCSB. Wamhoff noted in her report that she had recommended to Ann M. that she obtain a second psychiatric evaluation; however, Ann M. did not obtain such an evaluation. On November 9, 1995, an amended case plan was filed, which noted that Donald S. had been excluded as Johnathon's father. The case plan listed John M. as "Incarcerated Unknown Address."
On November 16, 1995, Chris D.'s mother, Gloria J., filed a motion to intervene as a party, in which she sought "temporary custody and possible permanent adoption" of her grandson, Gary M. On November 21, 1995, Ann M.'s mother, Judy C., filed a motion to intervene in which she asked for custody of all three children. On the same day, a hearing was held before a magistrate on Gloria J.'s motion to intervene, and on December 7, 1995, the magistrate filed an order which denied Gloria J.'s motion. On January 31, 1996, Gloria J. filed a motion for grandparent's visitation and companionship rights pursuant to R.C.3109.12.
The case proceeded to a permanent custody hearing on March 12, 13, 14, and 20, 1996, and April 5, 1996, at which testimony was presented by Morgal, Dr. Evans, several LCCSB employees, Chris D., Gloria J., Wamhoff, and Albert Shaneck, Ann M.'s neighbor. John M. did not attend any of the hearings. Ann M. did not attend the hearings which took place on March 20, 1996 and April 5, 1996.
On May 4, 1996, the trial court filed a judgment entry with findings of fact and conclusions of law. Specifically, after finding that all the parties were properly served with notice, the trial court found, based on the evidence presented at the hearings, the judgment entries and case plans, and all other evidence, including the report of the guardian ad litem, that LCCSB's efforts to rehabilitate Ann M. through counseling and providing services were unsuccessful, Ann M. failed to make significant progress in counseling, and that she continues to suffer from a delusional disorder, with a poor prognosis for recovery. The court further found that John M. is incarcerated following a conviction for involuntary manslaughter, and that he does not visit or communicate with Johnathon M., Chris D. is incarcerated and does not regularly communicate, visit or support Gary M., and that Chris D.'s date of release is uncertain. The court also found that Chris D. and John M. are repeatedly incarcerated and therefore prevented from caring for their children.
Based on these findings, the trial court concluded that the parents failed "continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child [sic] to be placed outside her [sic] home," and that Ann M. has a "severe and chronic mental illness that makes her unable to provide an adequate permanent home." The trial court also found that the children are adoptable, there is a reasonable probability that they will be adopted, their relationship with their fathers is "minimal," and they are doing well with the foster family. The court then awarded permanent custody of all three children to LCCSB. On July 2, 1996, Ann M. filed a timely notice of appeal; on July 5, 1996, Chris D. filed a timely notice of appeal; and on August 18, 1996, John M. filed a notice of appeal with leave of this court.
Generally, the standards for ruling on a motion for permanent custody are stated in R.C. 2151.353 and R.C. 2151.414. R.C. 2151.353(A)(4) provides that if a child is adjudicated abused, neglected or dependent, the court may commit the child to the permanent custody of the children's services agency pursuant to R.C. 2151.414 which reads, in pertinent part:
 "(B) The court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 "(1) The child is not abandoned or orphaned and the child cannot be placed with either of his parents within a reasonable time or should not be placed with the child's parents;
"* * *
 "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353
of the Revised code, the court shall consider all relevant factors, including, but not limited to, the following:
 "(1) The reasonable probability of the child being adopted, whether an adoptive placement would positively benefit the child, and whether a grant of permanent custody would facilitate an adoption;
 "(2) The interaction and interrelationship of the child with his parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 "(3) The wishes of the child, as expressed directly by the child or through his guardian ad litem, with due regard for the maturity of the child;
"(4) The custodial history of the child;
 "(5) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
 "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents:
 "(1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 "(2) The severe and chronic mental illness, severe and chronic emotional illness, severe mental retardation, severe physical disability, or chemical dependency of the parent makes the parent unable to provide an adequate permanent home for the child at the present time and in the foreseeable future;
"* * *
 "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
"* * *
 "(6) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
 "(7) The parent is repeatedly incarcerated and the repeated incarceration prevents the parent from providing care for the child;
 "(8) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."
An appellate court will not disturb a trial court's determination relative to the termination of parental rights and an award of permanent custody where such a determination is supported by clear and convincing evidence. In re Adoption ofHolcomb (1985), 18 Ohio St.3d 361, paragraph three of the syllabus. Clear and convincing evidence is that proof which established in the mind of the trier of fact a firm conviction as to the allegations sought to be proved. Cross v. Ledford (1954),161 Ohio St. 469, 477.
Appellant Ann M. asserts in her first and second assignments of error that the record does not contain clear and convincing evidence that it was in the best interest of the children for permanent custody to be awarded to LCCSB. In support thereof, Ann M. argues that the wishes of the children regarding custody were not expressed at the hearings by the guardian adlitem, and testimony was presented at trial that the children were not at risk in Ann M.'s care due to her delusional disorder. Ann M. also argues that she fully complied with and completed all of the recommended case plan services, including parenting classes, regular visitation with the children, and counseling. Finally, Ann M. argues that LCCSB was not interested in seeking permanent custody of her children until she was diagnosed with a mental illness, and that the "only reason" the agency was granted custody "is because she has not sought medication for her disorder."
At the hearings below, relevant testimony was presented by Morgal, LCCSB caseworkers Gayle Adams and Diane El-Assadi, Dr. Evans, LCCSB family visitation manager Mike Hiltman, and Wamhoff.
Morgal testified that she conducted a total of twenty-one therapy sessions with Ann M., and that Ann M. suffers from a delusional disorder which focuses on LCCSB, the police and her three children. Morgal stated that the goals of Ann M.'s therapy include correction of her poor judgment in child care selection, resolving her beliefs that the police were "out to get her," and coping with stress; however, Ann M. made no progress toward reaching those goals. Morgal further testified that she would have referred Ann M. for medication, but Ann M. stated she did not need medication, and refused to recognize that she had a problem, except for admitting her inability to choose appropriate babysitters.
Morgal testified generally that a delusional disorder is "a serious mental illness." Morgal also testified that Ann M. has a problem with hygiene and inappropriate dress, she is not receptive to suggestions, has difficulty taking feedback, and her biggest problem is that she is unwilling to change the circumstances that caused her to lose the children in the first place, i.e., her poor housekeeping and tendency to leave the children unsupervised or put them in the care of inappropriate persons. As to Ann M.'s relationship with LCCSB, Morgal stated that it was "a doomed relationship from the beginning" because Ann M. becomes very hostile when confronted with her shortcomings. Morgal further stated that "the delusions that [Ann M.] has clearly affected her inability to resolve any issue around her parenting with C.S.B.," even though she had done all the "concrete" things she had been asked to do.
Adams testified at the hearings that Ann M.'s case plan initially had reunification with the children as its goal, and included psychological evaluation, substance abuse assessment and counseling for Ann M., parenting classes, and regular communication with Adams, Ann M.'s caseworker. Adams further testified that her visits with Ann M. were initially in the home; however, visits were changed to Adams' office after Ann M. telephoned Adams' supervisor with allegations against Adams, and it was determined that home visits were no longer safe. Adams also stated that Ann M. never missed an office visit; however, sometimes her office visits had to be terminated early because of "situations" that came up.
Adams stated that Ann M. frequently made statements during her visits that Adams knew were not true. Specifically, Ann M. told Adams that a motorcycle gang was out to kill Ann M.; that Ann M. had contacted Indian Affairs to come and take the children, even though they have no native American heritage; LCCSB needs white babies to place in adoptive homes; and Johnathon M. was conceived when she was raped by John M. Ann M. also stated to Adams that she had run a day care in Kansas with thirty to thirty-five children; and that she intended to file a lawsuit against LCCSB for "emotional damage." Ann M. also reported being videotaped by LCCSB in her home, stated that LCCSB workers injected the children with drugs after her visits, and that LCCSB caseworkers get paid according to how may children they take from parents each month.
As to Ann M.'s visits with the children, Adams stated that the visits were "level 1" visits, which are supervised. Adams further stated that Ann M. would arrive early, often disrupting other visits in progress, and bring "literally a half a restaurant and half a toy store and set [it] up." Adams testified that Ann M. often gave the children age-inappropriate food, including uncut meat for one year old Johnathon.
As to the children, Adams testified that, as of the hearing date, all three had been in the same foster placement for one year, and that the foster parents have stated they are willing to adopt all three children together. Adams stated that the agency's decision to seek permanent custody was announced at the permanent planning staffing meeting on May 9, 1995, that permanent custody was in the best interest of the children, and the risk of the children going home with Ann M. was too great because Ann M. has not made any progress with her delusional disorder.
Dr. Evans testified at the hearing that Ann M.'s delusional disorder is characterized by certain beliefs that are not held by the general population, and that such a disorder is a "severe mental health problem." Evans stated that Ann M. is not likely to benefit from medication, because medication will not help a patient unless that patient first admits she has a problem. Evans further stated that Ann M.'s "prognosis for sustained improvement is very poor," she is unlikely to ever be cured, and that her delusional disorder could affect her ability to make the changes necessary to keep the children safe, because delusional people generally are not receptive to outside advice.
Hiltman testified that Ann M.'s visits with the children were held in a glass room, and were supervised at all times by LCCSB personnel. He further testified that several visits were almost terminated when Ann M. became very angry.
Hiltman stated that Ann M. frequently commented that Adams was trying to turn the children against her, and once argued with caseworker Kathy Coffey because Coffey placed her hand on Mary M.'s shoulder. On cross-examination, Hiltman testified that Ann M. brought "inappropriate" food for the children, in the form of pizza for one year old Johnathon and chicken that smelled as if it was rotten.
El-Assadi testified that she sometimes supervised Ann M.'s visits with the children, and that Ann M. was "frequently hostile" to LCCSB personnel during visits. El-Assadi further testified that Ann M. often argued with LCCSB workers and went into hysterics that took away up to fifty percent of her visitation time with the children. El-Assadi stated that Ann M. was "real consistent in her hostility," and that she exhibited no physical affection to the children, but focused the visits on food and toys.
Wamhoff, the children's guardian ad litem, testified that Johnathon was too young to choose where he would like to live; Mary was also too young to choose but stated she would like to be with "both" her foster family and her mother; and Gary, who was six years old at the time of the hearings, would like to live with his mother and his foster family in the same house. Wamhoff further stated that Ann M. refused medication because she believed it would alter her ability to parent.
Wamhoff testified that, in her opinion, Ann M. cannot provide adequate food and clothes for the children; however, she did not believe Ann M. would starve the children or fail to provide shelter. Wamhoff further testified that protective services for the children in Ann M.'s home was not a good alternative to custody with the agency, because Ann M.'s "poor judgment" put the children at risk. Wamhoff recommended to the trial court that permanent custody of the children should be awarded to LCCSB.
Shaneck testified briefly at the hearing that he is Ann M.'s neighbor, and that he never saw her exhibit disruptive behavior and never saw the children leave Ann M.'s home alone.
Upon consideration of the entire record of proceedings in the trial court, we conclude that there was clear and convincing evidence presented at the permanent custody hearing to support the trial court's finding that Ann M. failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the children to be placed outside her home, that Ann M.'s mental illness makes her unable to provide an adequate permanent home, and that it is therefore in the best interest of the children to award permanent custody to LCCSB. Ann M. repeatedly demonstrated that she was unable to recognize her problems as a parent, and failed to cooperate with caseworkers and health care professionals in seeking treatment for her mental disorder, despite numerous opportunities to do so. Despite testimony that Ann M. had completed the "concrete" aspects of attending parenting classes and counseling sessions, those persons evaluating her progress consistently stated that she was unable to adapt her parenting style or change the behaviors which initially caused the children to be removed from her home. Evidence further revealed that the children were adoptable, and that their foster parents had expressed an interest in adopting them.
Accordingly, the trial court did not err in awarding permanent custody of Gary, Mary and Johnathon M. to LCCSB, and appellant Ann M.'s first two assignments of error are not well-taken.
Appellant Ann M. asserts in her third assignment of error that the trial court erred by refusing to grant her funds to pay for an independent psychological examination by a psychiatrist of her own choosing.
Juv.R. 32(A)(1) provides that the trial court may order a mental examination in any proceeding after the filing of a complaint upon request of "the party concerning whom the * * * examination is to be made."
Adams testified at the hearing that LCCSB is only able to pay those health care providers which are under contract to the agency, and that it was never an option for Ann M. to choose her own therapist, who would then be paid by the agency. Adams also stated that the suggestion of a third referral was made partly because of Ann M.'s accusations against the agency and partly because Wamhoff requested another opinion to double check her diagnosis. Adams further testified that when Ann M. questioned Dr. Evans' diagnosis, a referral was made to a Dr. Hamme at the East Center. However, Dr. Hamme suggested to Adams that Ann M. should pick her own therapist and ask the court to pay for it, because Ann M. did not trust the opinion of any provider paid by LCCSB. Subsequently, when Adams suggested to Ann M. that she see an independent therapist, Ann M. told Adams she had previously seen a therapist in Kansas and her attorney had the report in his file.
Wamhoff testified that she wanted Ann M. to seek another psychological evaluation because the recommendations of Nicely and Dr. Evans differed as to the use of medication. Wamhoff further testified that Ann M. stated she would not pursue an independent psychological evaluation because she had no money, she previously had an evaluation done in Kansas, and she was not allowed to ask the court to pay for an evaluation.
Upon consideration, we find no evidence that Ann M. made a request for a independent psychiatric or psychological evaluation, and the trial court therefore did not err by not providing funds to pay a psychiatrist or psychologist of Ann M.'s own choosing. LCCSB did not ask the trial court to order appellant to undergo a psychiatric evaluation. Ann M. was evaluated by Nicely, Morgal and Dr. Evans before the agency decided to ask for permanent custody of the children in May 1995. Ann M. subsequently rejected Adam's suggestion that she ask the court to pay for an independent examination. Accordingly, appellant Ann M.'s third assignment of error is not well-taken.
Appellant Chris D. asserts in his first assignment of error that LCCSB failed to show by clear and convincing evidence that Gary M. could not or should not be placed with Chris D. within a reasonable period of time.
In determining that Gary M. cannot or should not be placed with Chris D. within a reasonable period of time, the trial court relied on three of the factors listed in R.C. 2151.414(E). First, the trial court found that Chris D. failed "continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside [his] home." R.C. 2151.414(E)(1). Second, the trial court found that Chris D. failed to visit and communicate with Gary M. on a regular basis, and demonstrated a lack of commitment to Gary M. by not "engaging in services that would make it safe for [Gary M.] to be returned home." R.C. 2151.414(E)(4). Third, the trial court found that Chris D. is "repeatedly incarcerated and that this incarceration prevented [him] from caring" for Gary M. R.C.2151.414(E)(7).
At the hearings below, Adams testified that she sent Chris D. a letter on August 22, 1994, and received a telephone call from Chris D. on October 5, 1994. During the call, Chris D. asked Adams for pictures of Gary M. and said he would stay in touch; however, he expressed no interest in custody of Gary, other than to say his mother might be willing to take Gary. Adams stated that she received no other communication from Chris D. On cross-examination, Adams stated that Chris D. was sent papers from LCCSB after the permanent planning staffing on May 9, 1995, when the decision was made for the agency to ask for permanent custody of the three children. Adams further stated that she would have considered taking Gary M. to visit Chris D. in prison if Chris D. had asked for a visit.
Chris D. testified at the hearings that he was seventeen years old when Gary M. was born, and he was incarcerated shortly after Gary's birth. He had little contact with the child, except when he lived with Ann M. "on and off," for a period of four or five months, while he was on probation in 1992. Chris D. further testified that he violated his probation and was sent back to prison in January 1993, to serve his original prison sentence of five to fifteen years for aggravated burglary. He testified that he would be eligible for parole in July 1996. Chris D. also stated that he did not know Gary M. was his child until December 1992, and it is "fair to say" he was not really involved with Gary M. until paternity was established.
Chris D. testified that Adams offered him the opportunity to take parenting classes upon his release from prison; however, she made no arrangements for him to visit with Gary, and no one had contacted him recently regarding his wishes for custody of Gary. He further testified that he understood that he could send cards and letters, and he has sent pictures of himself and some drawings to Ann M. to give to Gary. He stated that Ann M. brought Gary to visit him at the Marion Correctional Facility on two separate occasions. Chris D. also testified that he never asked for pictures of Gary M., never asked about Gary's grades in school, never paid child support, does not know which school Gary attends, and never requested any other information regarding Gary's welfare from LCCSB. When asked, Chris D. stated that Gary M.'s birth date is July 5, 1990, when in fact it is May 15, 1990.
Upon consideration of the entire record of proceedings in the trial court, we conclude that there was clear and convincing evidence presented at the permanent custody hearing to support the trial court's finding that Gary M. could not be placed with appellant Chris D. within a reasonable time or should not be placed with appellant. Chris D. was incarcerated for all but one year of Gary M.'s life, during which he had contact with the child sporadically over a period of four or five months. By his own admission, Chris D. had no parental relationship with Gary M. until paternity was established in December 1992, one month before Chris D. returned to prison for violation of his probation. While incarcerated, Chris D. made little or no effort to communicate with his son, even though he testified at the hearings that he knew cards and letters could be sent and that he could call LCCSB for information regarding Gary M.'s welfare. In spite of Chris D.'s testimony that he was eligible for parole in July 1996, the fact remains that he is incarcerated to this day and is unable to care for his young son.
Accordingly, appellant Chris D.'s first assignment of error is not well-taken.
Chris D.'s second and third assignments of error will be considered together. In his second assignment of error, Chris D. asserts that the trial court erred by not considering his mother, Gloria J., as a suitable relative to have custody of Gary M. Alternatively, Chris D. asserts that R.C. 2151.414(B) is unconstitutional because it distinguishes between children subject to a motion for permanent custody and orphans. In his third assignment of error, Chris D. asserts that the trial court failed to consider whether granting permanent custody of Gary M. to LCCSB was in his best interest, independent from the interest of his two half-siblings.
As to Chris D.'s first assignment of error, R.C.2151.412(G)(2) provides that, in reviewing the public children services agency case plan for a child, the court shall be guided by the general priority that:
 "[i]f both parents * * * have become incapable of supporting or caring for the child even with reasonable assistance, or have a detrimental effect on the health, safety, and best interest of the child, the child should be placed in the legal custody of a suitable member of the child's extended family."
This court has consistently held that "the language of R.C.2151.412(G) is precatory, not mandatory. It does not require the court to favor a relative, rather than the children services agency, in granting custody." In re seven A. Children (Sept. 22, 1995), Fulton App. No. F-95-002, unreported. The overriding concern in determining whether to grant permanent custody is whether, "after considering all the factors, it would be in the child's best interest to grant permanent custody to the agency."In re Taceia R. (Feb. 16, 1996), Lucas App. No. L-95-155, unreported.
In this case, Adams testified at the hearings that when Gloria J. visited Gary on August 11, 1994, the day that Ann M. signed the initial case plan, she and Adams discussed placement of all three children with Gloria J., and Adams asked Gloria J. if she wanted custody of Gary. Adams stated that Gloria J. declined custody of Gary at that time, stating that she was working and could not accept placement or custody of Gary M. Adams testified that Gloria J. asked for a Christmas visit with Gary on December 7, 1995, and that the visit took place on December 22, 1995; however, Gloria J. did not ask for any more visits and Adams did not offer her more visits. Adams further stated that she checked Gloria J.'s name through the agency's clearing data bank, and found that Gloria has a past history with the agency and, in her opinion, would not be an appropriate placement for Gary. She also testified that no other suitable relatives were found with which to place the children. Gloria J. testified at the hearing that she declined custody of Gary in August 1994, because she did not want Ann M. to use her to "get to Chris," and that she changed her mind and asked for custody in November 1995, after Chris D. told her about the permanent custody hearing. She stated that she would agree to take Gary until Chris D. is out of prison; however, she would be concerned as to how visitation with Ann M. would take place if the child lived with her. Gloria J. further stated that she had to call repeatedly to schedule the December 22, 1995 visit with Gary at the agency, and that Gary enjoyed the visit and asked her to return. She said that no further visits were offered and she did not ask to come to any more visits with Ann M. because Ann is "obsessed" with her son, Chris D.
As to whether R.C. 2151.414(B) is unconstitutional, this court has determined that, when read in pari materia with R.C.2151.353(A)(2)[1] and R.C. 2151.412(G), no unconstitutional distinction exists "between the statutes governing permanent custody between orphans or abused, neglected and dependant [sic] children." In re Taceia R., supra.
As to Chris D.'s third assignment of error, the record reflects that Gloria J. had minimal contact with Gary M. during the one and one-half years he was in foster care, and Gloria J. did not visit Gary more often because she did not want Ann M. to use her to "get to" Chris D. In addition, Adams testified that it was in the best interest of all three children for them to remain together. Finally, Wamhoff, the children's guardianad litem, testified at the hearings that it was in Gary's best interest to remain with his two half-siblings instead of living with Gloria J., stating:
 "my main reasoning for these three sibs to stay together is they are sibs, and Gary's at the point where he's very impressionable and he depends on his younger one as well as they depend on him, and I think it might be very cruel to separate in that instance."
Upon consideration, this court finds that the record contains clear and convincing evidence sufficient to support the trial court's award of permanent custody of Gary M. to LCCSB, and the trial court's decision not to award custody of Gary M. to a relative was not improper. Accordingly, Chris D.'s second and third assignments of error are not well-taken.
Appellant John M. asserts in his first assignment of error that the trial court's judgment is "void" because LCCSB obtained service on John M. by publication, without making a reasonable effort to determine where he was imprisoned after leaving the Lucas County Jail. John M. further asserts that, as a result of the defective service, he was not given "adequate notice and opportunity to be heard with respect to his commitment to parenthood," which includes "the ability to identify relatives to care for his child" while he is incarcerated.
R.C. 2151.29, which provides for service of summons in cases where a state agency seeks permanent custody of a child states, in relevant part:
 "Whenever it appears by affidavit that after reasonable effort the person to be served with summons cannot be found or his post-office address ascertained, whether he is within or without a state, the clerk shall publish such summons once in a newspaper of general circulation throughout the county. * * * A copy of the summons and the complaint shall be sent by registered or certified mail to the last known address of the person summoned unless it is shown by affidavit that a reasonable effort has been made, without success, to obtain such address. * * *"
A review of the record reveals that a copy of LCCSB's motion for permanent custody was sent to John M. at the Lucas County Jail. On June 27, 1995, a notice was sent to Elaine Kemley at LCCSB that service could not be obtained on John M. at the jail because he had been moved to "Orient Correctional," and that the summons was being forwarded by certified mail to John M. at that facility. The juvenile court docket sheet reflects that on July 11, 1995, "Certified Mail service was made John [M.] signed by Agent." On August 1, 1995, service of the summons on John M. was also perfected by publication. As previously stated, John M. did not attend the permanent custody hearing, which was held over the course of five separate days.
Upon consideration of the foregoing, we find that LCCSB did use reasonable efforts to locate John M. and did in fact locate him and serve him with notice of the permanent custody hearing by certified mail, in addition to notice by publication. Accordingly, appellant John M. was given adequate notice and opportunity to be heard, and his first assignment of error is not well-taken.
Appellant John M. asserts in his second assignment of error that the record does not contain clear and convincing evidence that Johnathon M. could not be placed with John M.
The trial court found that John M. failed "continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside [his] home," failed to visit and communicate with Johnathon M. on a regular basis, and demonstrated a lack of commitment to his son by not "engaging in services that would make it safe for [Johnathon M.] to be returned home," and is "repeatedly incarcerated and that this incarceration prevented [him] from caring" for Johnathon M.
Gayle Adams testified at the permanent custody hearings that she met with John M. at the Lucas County Jail, where he was incarcerated after being charged with involuntary manslaughter, on August 16, 1994, and again on October 19, 1994. Adams stated that she was later informed that John M. was convicted and sentenced for involuntary manslaughter. Adams further testified that she took Johnathon M. to see John M. in jail on October 19, 1994, when Johnathon was four months old, and since that time John M. had not requested visitation or made telephone calls concerning his son, or had he sent cards, letters, or presents to Johnathon. Adams stated that John M. received copies of the initial case plan and amended case plan while he was in the Lucas County Jail. She further stated that John M. was found to be Johnathon's father on August 18, 1995, as a result of a paternity test which was performed after Ann M. named both Donald S. and John M. as Johnathon's possible fathers.
At the hearing, a copy of the "Judgment Entry of Sentencing" was made part of the record, which reflects that on November 15, 1994, John M. was found guilty of involuntary manslaughter during the commission of a misdemeanor, in violation of R.C. 2903.04(B), and was committed to the Ohio Department of Corrections for a term of three to ten years, with credit for one hundred thirty-one days served prior to sentencing.
As previously stated, John M. received notice of the impending permanent custody hearing on July 11, 1995. The hearings commenced on March 12, 1996. It is undisputed that, in the intervening eight months, John M. made no efforts to contact Adams regarding Johnathon's welfare or his future. John M. did not attend the custody hearings.
Upon consideration, this court finds that there was clear and convincing evidence presented at the permanent custody hearing to support the trial court's finding that Johnathon M. could not be placed with appellant John M. within a reasonable time or should not be placed with John M. John M. was incarcerated at the time that LCCSB filed the original complaint for permanent custody, and remained incarcerated at the time of the hearings. Although John M. had visited once with Johnathon when Johnathon was four months old, he subsequently showed no interest in his child's welfare, or made any attempt to otherwise establish a relationship with his son. The record demonstrates that the issue of Johnathon's parentage was resolved because Ann M. named two individuals as possible fathers, and not because John M. took any initiative in determining that he was Johnathon M.'s father. The record supports John M.'s assertion that he has only been incarcerated once; however, even given credit for time served, the earliest date John M. could have been released from prison was approximately two years after the initial filing of the motion for permanent custody, and no evidence was presented that John M. would be released early.
Accordingly, appellant John M.'s second assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is hereby affirmed. Court costs of these proceedings are assessed equally to appellants Ann M., Chris D., and John M.
JUDGMENT AFFIRMED.
George M. Glasser, J.
 James R. Sherck, J.
 Richard W. Knepper, J.
CONCUR.
[1] R.C. 2151.353(A)(2) provides that if a child is adjudicated an abused, neglected, or dependent child, the court may "[c]ommit the child to the temporary custody of a public children services agency, a private child placing agency, either parent, a relative residing within or outside the state, or a probation officer for placement in a certified family foster home."